Filed 4/28/23 P. v. Spann CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092586 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE012187) |
| v. | |
| NICORY MARQUIS SPANN, | |
| Defendant and Appellant. | |

Defendant Nicory Marquis Spann shot Sacramento County Sheriff's Deputy Alex Ladwig in the face at a light rail station in Sacramento. Defendant asks us to reverse his convictions for attempted murder and assault on a peace officer with a semiautomatic weapon because of prosecutorial misconduct during closing argument. The People contend defendant forfeited this issue by failing to object and defendant has not demonstrated his counsel performed ineffectively by not objecting. Defendant also

1

argues he should be resentenced because of a retroactive change to the procedures for selecting upper term sentences. The People respond that the trial court's failure to follow the new procedures was harmless. On both issues, we agree with the People. Accordingly, we will affirm defendant's convictions and sentence.

BACKGROUND

A.    *Evidence at Trial*

Defendant spent the night in a park after being kicked out of his father's house. The next day, he rode the light rail to the Watt Avenue and Interstate 80 station at the end of the line. Defendant spoke with transit agent Angelah Cannon, who told him he would have to leave the lower platform where the trains arrived if he did not have a ticket. Defendant responded: "I don't trust you. You're the fucking police." Cannon led defendant to the upper platform. Two hours later, she saw him seated on the lower platform again.

Around the time Cannon saw defendant back on the lower platform, Deputy Alex Ladwig arrived at the station. Deputy Ladwig worked for the Sacramento County Sheriff's Department in the Sacramento Regional Transit Division. His duties included checking fares at light rail stations, responding to calls from the public or transit agents, and investigating crimes connected to the light rail system.

While patrolling the light rail station, Deputy Ladwig asked a woman smoking a cigarette on the lower platform to move to the designated smoking area. Defendant, who was standing nearby, began moving erratically and yelling profanities at Deputy Ladwig and calling him a "racist pig" and "cracker cop," among other things. Deputy Ladwig asked defendant if he was okay, and defendant began to walk away. Defendant calmed down once he was farther away, so Deputy Ladwig returned to his patrol car.

At this point, a woman whom defendant had been following and touching walked over to the deputy's car and told the officer that defendant had been touching her. Defendant then turned around and approached the patrol car. Deputy Ladwig got out of

2

his car and walked toward defendant to check his fare. At the deputy's approach, defendant continued angrily yelling profanities, while clenching his teeth and balling up his fists.

Deputy Ladwig asked to see defendant's ticket, which defendant eventually produced. Finding the ticket expired, the deputy asked defendant to purchase another ticket or leave the station. Defendant began walking away, but toward the path to the next station rather than toward a ticket machine or out of the station. Defendant continued acting erratically and turned back to continue yelling at the deputy. Deputy Ladwig then told defendant to stop so that he could give defendant a citation. The deputy asked for defendant's identification, but defendant said he did not have identification. Deputy Ladwig then asked defendant for his name. At first, defendant did not respond, but after repeated requests, defendant began saying his name very loudly and quickly so that the deputy could not understand. In between shouting his name multiple times, defendant continued behaving erratically and using profanities.

After several repetitions, defendant again walked away, but Deputy Ladwig followed him and asked him to take a seat on a bench in the station. Defendant sat down, but refused to say his name slowly enough for the deputy to understand. A train pulled into the station, and a transit agent who had just gotten off saw the situation and called for backup over the radio.

Deputy Ladwig wanted to keep defendant detained until backup arrived, which he expected to take at least 10 minutes. At some point, defendant stood up, but sat back down when the deputy told him to. When defendant stood up again, Deputy Ladwig unholstered his Taser, held it by his side, and said he would tase defendant unless defendant sat down. Defendant acted like he was going to sit back down, but as soon as the deputy's Taser clicked back into the holster, defendant lunged at him.

Defendant wound up to punch Deputy Ladwig. The deputy took a defensive stance, and defendant backed off. The deputy then tried to grab defendant and control his

3

arms.  After several seconds of struggling, Deputy Ladwig felt defendant tugging at his gun.  The two men tripped and fell.  As he was falling, the deputy felt the mechanism securing his gun in its holster release.  Deputy Ladwig landed on his back.  Defendant landed on his knees above the deputy with the deputy's gun in his hand.  Defendant then shot the deputy in the face from only a few inches away.

Deputy Ladwig pushed defendant off him, and defendant's second shot narrowly missed the deputy's face.  The deputy ran to his car to try to grab another gun, but could not find one.  Deputy Ladwig then ran to seek cover behind some bike lockers, with defendant following and waving the gun above his head in a celebratory manner.  A bystander who had been recording the fight with a cell phone told defendant he had better get out of there before the police came to get him, at which point defendant stopped and looked around.  Defendant then walked over to a storm drain, dropped the gun in, and walked off.

The gunshot shattered the left side of Deputy Ladwig's jaw and fractured the right side.  A 13-centimeter laceration ran from the deputy's tongue back to his tonsil and over to his cheek, and part of his fractured jawbone was protruding into his mouth.  He spent 11 days in the trauma intensive care unit and spent six weeks with his jaw wired shut and titanium plates holding his right jawbone together.  After approximately 20 surgeries, including reconstruction of his left jawbone using a bone from his lower leg, Deputy Ladwig still has no feeling or function in 90 percent of his tongue and requires a hearing aid.  He spent almost a year learning to speak again and required significant rehabilitation for the leg from which the bone was removed.

Police officers later arrested defendant at a nearby hotel.  When an officer searched defendant's suitcase, they found his identification inside.

Defendant testified at trial and admitted shooting Deputy Ladwig.  Defendant did not like police officers and thought that the deputy was harassing him.  Deputy Ladwig ordered him to get on the ground, but defendant refused because police officers had

4

previously slapped him in the face after making him get on the ground. When shown a video of him lunging at the deputy, defendant explained that he had thought about assaulting the deputy but decided not to and stepped back. When Deputy Ladwig then approached defendant to arrest him, defendant decided that he needed to use the deputy's gun before the deputy did. Defendant denied intending to kill the deputy when he pulled the trigger, claiming both gunshots were just reactions and the second shot was "just like normal."

While watching the video of his confrontation with Deputy Ladwig during cross-examination, defendant stated, "He said get on the ground right there. I'm not getting on the ground." The prosecutor responded, "Okay. Wait until I have a question. We already heard what you believe." Defendant then stated, "I don't really give a fuck. I don't really give a fuck. He can do whatever, doesn't matter. He got shot in his face, and I'm fucking happy about that shit. He got popped, POP, POP, all in his mother fucking face. I did that shit."

### B. *Verdict and Sentencing*

The jury found defendant guilty of attempted murder of a peace officer (Pen. Code, §§ 664, 187, subd. (a))[1] and assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)) and found true all three firearm use allegations for each offense (§ 12022.5, subds. (b)-(d)).

At sentencing, defense counsel acknowledged that he had reviewed the probation report and discussed it with defendant. Defendant did not object to or dispute any of the evidence presented by the probation officer. The court found seven aggravating circumstances: the crime involved great violence, great bodily injury, and acts disclosing a high degree of cruelty, viciousness, and callousness (Cal. Rules of Court, rule

---

[1] Undesignated statutory references are to the Penal Code.

4.421(a)(1))[2]; defendant used a firearm to commit the crime (rule 4.421(a)(2)); defendant "engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)); defendant had numerous prior convictions (rule 4.421(b)(2)); defendant served a prior prison term (rule 4.421(b)(3)); defendant was on probation when he shot Deputy Ladwig (rule 4.421(b)(4)); and defendant's prior performance on probation had been unsatisfactory (rule 4.421(b)(5)). The trial court found no mitigating circumstances because defendant had demonstrated that his actions and lack of remorse were not the result of mental illness, but instead were a result of "a deep hatred." Considering these circumstances, the trial court refused to strike the firearm enhancements or impose a lesser firearm enhancement. Accordingly, the court sentenced defendant to life in prison with the possibility of parole for attempted murder of a peace officer (§ 664, subd. (e)), plus 25 years to life for the firearm enhancement (§ 12022.5, subd. (d)), and the upper term of nine years in prison for assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)), plus 25 years to life for the firearm enhancement (§ 12022.5, subd. (d)) The court then stayed the sentence for assault with a firearm and the associated enhancement pursuant to section 654.

Defendant timely appealed in September 2020. After several extensions of time for the trial court to supplement the record and for the parties to prepare briefs, defendant filed his opening brief on July 25, 2022. This case became fully briefed in December 2022, and was assigned to this panel shortly thereafter.

---

[2] Undesignated rule references are to the California Rules of Court.

6

DISCUSSION

I

*Prosecutorial Misconduct*

Defendant contends we must reverse his convictions because of prosecutorial misconduct during closing argument. We disagree.

A. *Closing Arguments*

In the first portion of her closing argument, the prosecutor focused extensively on how defendant's actions and his testimony at trial belied his claim that he acted in self-defense. The prosecutor then told the jury:

"And this case has had similar effects on me since I watched the video. That video was chilling to watch. Slow it down. Watch him pull back and shoot that officer in the face and have no regard for what he did. Watch him celebrate afterward. I thought about, you know, I'm raising two girls. I thought about is this the world that I want my children to be raised in. And it affected me just like yesterday affected me, and it should affect all of you.

"I watched [the bystander recording the video of the fight] in disgust. I've watched that video over and over again with the same sinking feeling, what is this world we have come to live in? And I thought I just want to keep my kids in that bubble forever. We should really all feel that way about people we love, children, significant others, whoever they may be and protect them.

"And it wasn't til I saw what Mr. Hollaway did that my faith was restored. Because he got off that train. He was already on the train. He could have turned his head like everyone else did that day. He got off the train when he saw that the Deputy, a human being, had been shot in the face and was bleeding profusely, as he described. And he ran over, and he took the shirt off his back to help save that officer. And who knows, maybe he did. But for Mr. Hollaway and the pressure put on his face, it was five minutes before help arrived. That restored my faith in humanity. Because not everybody is good,

and not everyone will look out for our loved ones. But he didn't care what color skin the officer had. He didn't care who the officer was. He didn't help him because he was an officer and put on a uniform. He went to help him because he was a human being who had been shot in the face and could die.

"Deputy Ladwig, yes, he's a police officer. Yes, he swore to protect the public imperfect or perfect as that system may be. But he's a human being. He's somebody's grandson. He's somebody's child. He's somebody's husband. Hopefully one day despite the Defendant's best efforts, he will be somebody's father. He is a human being. And this case is not about like or dislike of police officers or injustices that have happened in the past. It's about this case, this officer, this human being, and what the Defendant did.

"Despite his very best efforts Alex Ladwig will live another day. Whether he ever goes back out on the streets or not, I don't know. It's chilling to live through something like this. And every time he would meet with me and ask me, you know, how's it going to go? The family would ask me, What's going to happen? And I always told them, I can't predict what 12 people of the community will do. I can have faith in it, but I can't predict it.

"But I always told him and the family that the truth you know it here. The truth always comes out whether it's in the court or later. The truth is something that rings true, you know it. And we saw it from the witnesses in this courtroom in this case with this officer, with this human being. And the Defendant spoke his truth loud and clear for us to hear yesterday. And his truth, as he screamed it, was not, I shot this officer in self-defense. His truth loud and clear and he can never take it back, there is just no coming back from that. Mr. Spangler is a fantastic attorney, and you can't take that back. You can't fix that. His truth was that he pulled that gun out, shot the officer in the face, and he was happy he did it.

8

"So when you go back and you deliberate and you think about this case and this case, not out there, this courtroom, this evidence, this police officer, this human being, you let justice be served by your verdicts. I can't tell you what that justice is. That's why there are 12 of you. But you let that reflect the truth.

"And when you sign those verdict forms, you know that justice will be served. That's all I ask three years later for this officer, this family, let it be served by your verdicts."

Defendant did not object to any of this argument. Instead, defense counsel addressed the prosecutor's argument at the end of his closing argument:

"Ms. Anderson is a very accomplished prosecutor. In her closing argument, she was appealing to your sympathy, to your passions. This isn't about your sympathy or your passions. This is about what you, as jurors, can arrive at logically and reasonably in drawing inferences from the evidence that you were presented.

"Again, it was a terrible thing that Deputy Ladwig was shot, and he has suffered greatly. There's no question. This isn't a question about how badly he suffered. This is a question of how did Mr. Spann act in this particular situation and is it justified. I do agree with Ms. Anderson that the truth go [*sic*] out.

"Deputy Ladwig used unreasonable force while acting outside the scope of his duties. Mr. Spann was put in unreasonable fear for his -- or reasonable fear for his life and safety, and he reacted in the only manner that seemed appropriate to him at that moment to preserve his life. He's not guilty of the crimes that are charged, and we look forward to you returning a not guilty verdict."

*B. Forfeiture*

As an initial matter, the People contend defendant forfeited this claim of prosecutorial misconduct by failing to object. We agree.

"In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the

9

harm is the claim of misconduct preserved for review." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) Defendant did not object at all during the prosecutor's closing argument.

Defendant argues an exception to the forfeiture rule should apply because objection and admonition would not have cured the harm from the prosecutor's improper argument. Defendant quotes *People v. Kirkes* (1952) 39 Cal.2d 719, 726, suggesting that an objection "might well have served to impress upon the jury the damaging force of the challenged assertions." Our Supreme Court has limited this language in *Kirkes*, noting: "This exception, of course, would swallow the rule requiring a timely objection and request for admonition, for one always runs the risk of drawing the jury's attention to an improper line of argument by registering an objection. The mere concern of highlighting alleged misconduct by objecting, without more, cannot serve as an exception to the general rule requiring an objection and request for an admonition." (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) The prosecutor's argument in this case is not comparable to the misconduct in *Kirkes*, wherein the prosecutor asserted personal knowledge from an unidentified source not in evidence of the defendant's guilt, implied he would not have prosecuted had he not believed in the defendant's guilt, and suggested the defendant would kill again to cover his crime and prevent witnesses from testifying, with "no evidence whatever upon which to base that statement." (*Kirkes*, at pp. 723-725; see *People v. Visciotti* (1992) 2 Cal.4th 1, 80.) The *Kirkes* court also noted that the improper remarks "were interspersed throughout the closing argument in such manner that their cumulative effect was devastating." (*Kirkes*, at p. 726.) Here, by contrast, the remarks to which defendant failed to object occurred all at once and take up a small fraction of the entirety of the prosecutor's closing argument.

We conclude defendant has failed to demonstrate either that an objection would not have stopped this line of argument or that an admonition would not have cured any harm. Accordingly, defendant has forfeited this issue on appeal.

10

## C. Ineffective Assistance of Counsel

Anticipating this conclusion, defendant also argues his counsel performed ineffectively by failing to object to the prosecutor's argument. We are not persuaded.

While we agree with the parties that the prosecutor committed misconduct by invoking the safety of her own children, suggesting the jurors should protect their own loved ones from defendant, and referring to conversations she had with the deputy and his family, a defendant may not "automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14; see *People v. Riel* (2000) 22 Cal.4th 1153, 1202-1203.) Rather, "[t]o establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.)

"[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson, supra*, 49 Cal.4th at p. 122.) " 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." ' " (*People v. Samayoa, supra*, 15 Cal.4th at pp. 845-846.) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct

11

falls within the wide range of reasonable professional assistance." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

Here, rather than objecting, defense counsel addressed the prosecutor's remarks in his own argument, pointing out to the jury that the prosecutor was improperly appealing to their "sympathy" and "passions." Defense counsel urged the jurors instead to rely on logic and reason to determine whether Deputy Ladwig used unreasonable force and whether defendant reasonably feared for his life and safety. This indicates defense counsel made a tactical decision, which we may not second-guess. Defense counsel may also have been happy to let the prosecutor talk about personal matters because it meant she stopped discussing defendant's disastrous testimony on cross-examination: "I don't really give a fuck. He can do whatever, doesn't matter. He got shot in his face, and I'm fucking happy about that shit. He got popped, POP, POP, all in his mother fucking face. I did that shit." Defense counsel could reasonably have considered that testimony, the last piece of evidence the jury heard in the case, so damaging that any other argument was a welcome distraction.

We conclude defendant has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

II

*Defendant's Upper Term Sentence*

Defendant contends we must remand for resentencing because amendments made to section 1170 while his appeal was pending apply retroactively and the trial court relied on aggravating circumstances that were not proven according to the new procedures. The People agree that the amended law applies retroactively but contend that any error was harmless. We agree with the People.

Effective January 1, 2022, the Legislature amended section 1170, subdivision (b) so that, among other things, a sentencing court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify

12

the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2), as amended by Stats. 2021, ch. 731, § 1.3.) We agree with the parties that the amended version of section 1170, subdivision (b) applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*).)

We first note that the trial court did not violate defendant's Sixth Amendment right to a jury trial by imposing an upper term sentence in this case. In general, "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*People v. Black* (2007) 41 Cal.4th 799, 816.) This is true because, under current California law, like under prior law in place until 2007, a jury's finding of a single aggravating circumstance is sufficient to make a defendant eligible for an upper term sentence. (*Id.* at pp. 812-816; *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111-1112; see *People v. Osband* (1996) 13 Cal.4th 622, 730 [holding that, when sentencing court must impose middle term "unless there are circumstances in aggravation or mitigation of the crime," a single factor in aggravation suffices to support an upper term]; *People v. Blakeley* (2000) 23 Cal.4th 82, 89 ["when the Legislature amends a statute without changing those portions of the statute that have previously been construed by the courts, the Legislature is presumed to have known of and to have acquiesced in the previous judicial construction"].)

Here, three of the seven aggravating circumstances relied upon by the trial court were found in compliance with the Sixth Amendment. First, defendant testified that he had been previously convicted of three felonies. Either as admissions or as findings of prior convictions, the trial court established these facts in compliance with the Sixth

Amendment. Similarly, the trial court established that defendant had served a prior prison term and was on probation at the time he shot Deputy Ladwig. Our Supreme Court has held that these findings do not infringe the right to a jury trial. (*People v. Towne* (2008) 44 Cal.4th 63, 81-82.) Because any one of these three aggravating circumstances rendered defendant eligible for an upper term sentence under current law, the trial court's reliance on other factors did not violate defendant's constitutional rights. (See *id.* at p. 86; *Harris v. United States* (2002) 536 U.S. 545, 558 ["Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments"].)

Though the trial court's selection of the upper term did not violate the Sixth Amendment, it did violate the new provisions of section 1170, subdivision (b) because none of the underlying facts for the seven aggravating circumstances the trial court relied upon were found true beyond a reasonable doubt by a jury and defendant did not stipulate to the truth of any. But the California Constitution forbids us from vacating defendant's sentence based on this error alone. Rather, we must determine, "after an examination of the entire cause, including the evidence," whether the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) In other words, we must affirm a judgment unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In this context, we first determine whether a jury would have found any of the underlying facts not true and "then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Zabelle*, *supra*, 80 Cal.App.5th at p. 1112; see *People v. Epps* (2001) 25 Cal.4th 19, 29-30 [no reasonable probability of a result more favorable to the defendant had the jury, instead of the court, determined that the defendant suffered disputed prior convictions]; *People v. Price* (1991) 1 Cal.4th 324,

14

492 ["When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper"].)

Here, we are confident the jury would have found true the facts underlying five of the seven aggravating circumstances the trial court specified: the crime involved great violence, great bodily injury, and acts disclosing a high degree of cruelty, viciousness, and callousness (rule 4.421(a)(1)); numerous prior convictions (rule 4.421(b)(2)); a prior prison term (rule 4.421(b)(3)); defendant being on probation when he shot Deputy Ladwig (rule 4.421(b)(4)); and unsatisfactory prior performance on probation (rule 4.421(b)(5)). First, the evidence is overwhelming and undisputed that the crime involved great violence and acts disclosing a high degree of cruelty, viciousness, and callousness. The act of holding a gun inches from another person's face and pulling the trigger arguably meets this standard by itself. But defendant's own testimony, which the judge quoted at the sentencing hearing, makes the determination much easier: "I don't really give a fuck. He can do whatever, doesn't matter. He got shot in his face, and I'm fucking happy about that shit. He got popped, POP, POP, all in his mother fucking face. I did that shit." The jury also saw video of defendant celebrating after shooting the deputy and heard testimony that defendant, while in jail the morning after the shooting, yelled, "I shot that cracker cop. I'm not going to stay. I am going to sue you." Given this evidence, we are confident a jury would have found the facts underlying this aggravating circumstance true beyond a reasonable doubt.

We are likewise confident a jury would have found true beyond a reasonable doubt each of the four aggravating circumstances that relate to defendant's criminal history. Defendant testified repeatedly that he had three prior felony convictions; a jury would have no reason to doubt him. The probation officer also reported that defendant had four prior misdemeanor convictions, was on probation at the time of the shooting for

15

assault against a custodial officer in San Joaquin County case No. CR-2016-0006533, and had served 16 months in prison for being an accessory to receiving stolen property in Santa Clara County case No. CC815665. We presume the probation officer performed his statutory duty properly. (Evid. Code, § 664; Pen. Code, § 1203, subds. (b), (g).) Importantly, defendant did not object to or dispute this evidence, despite having the opportunity to do so (§ 1170, subd. (b)(4)) and despite the relative ease with which defendant could have obtained records from these cases if the probation officer was mistaken (see, e.g., §§ 11120-11127; Gov. Code, § 68152, subd. (c)). Lastly, it is more than likely that the jury would consider committing the current offenses while on probation to be unsatisfactory performance. Based on this evidence, we conclude a jury would have found the facts underlying these four aggravating circumstances true beyond a reasonable doubt.

On the other hand, we are not confident a jury would have found true the facts underlying the remaining two aggravating circumstances relied on by the trial court. First, whether defendant "engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)) rests on a somewhat vague and subjective standard, which makes it difficult "to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.) We are also mindful that we "cannot necessarily assume that the record reflects all of the evidence that would have been presented had aggravating circumstances been submitted to the jury." (*Id.* at p. 839.) Accordingly, we cannot say with confidence that the jury would have found the facts underlying this circumstance true beyond a reasonable doubt. Second, using defendant's use of a firearm as an aggravating circumstance (rule 4.421(a)(2)) constituted improper dual use of facts, since the trial court also sentenced defendant to 25 years to life in prison for personally and intentionally discharging a firearm and proximately causing great bodily injury. (§ 12022.53, subd. (d); see § 1170, subd. (b)(5) ["The court may not

16

impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law"].) Though defendant did not object to this improper dual use at sentencing, we are here considering hypothetically what would happen were the underlying facts found by a jury, and we cannot say with confidence that defendant would have failed to object in that situation.

Having determined that five of the seven aggravating circumstances would survive retroactive application of the amendments to section 1170, subdivision (b), we next determine whether there is a reasonable probability the trial court would have imposed a lesser sentence had the court known it could not rely on the two improper aggravating circumstances. (*Zabelle*, *supra*, 80 Cal.App.5th at p. 1112.) A reasonable probability "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) In this context, a reasonable probability of a more favorable result exists where the improper factor was determinative for the sentencing court or where the reviewing court cannot determine whether the improper factor was determinative. (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)

Here, we see no reasonable probability the trial court would impose a lesser sentence relying on only five aggravating circumstances. The trial court found no mitigating circumstances to weigh against the aggravating circumstances. (Cf. *People v. Price*, *supra*, 1 Cal.4th at pp. 491-492 [considering four improper aggravating circumstances was harmless where three aggravating circumstances remained, and court found no mitigating circumstances].) And the court focused especially on defendant's violence and callousness in how he reacted after shooting the deputy, citing "the horrific nature of this offense" and particularly quoting defendant's outburst at trial. (Cf. *People v. Avalos*, *supra*, 37 Cal.3d at p. 233 [sentencing court's remarks emphasizing two particular factors that were not improper makes clear that improper factors were not determinative].)

17

We look also to the broader context at the sentencing hearing. (Cal. Const., art. VI, § 13.) The trial court declined to strike the maximum enhancement and impose only lesser enhancements for using a gun to commit the offenses, explaining that, because of the "deep hatred" demonstrated by defendant, there was no basis to strike the enhancement and it could not "imagine any basis or any judge doing it." Even after sentencing defendant to 32 years to life in prison for attempted murder and knowing that it would stay the sentence for assault pursuant to section 654, the trial court still imposed the nine-year upper term, plus another 25 years to life for using a firearm. We conclude there is no reasonable probability the trial court would impose a lesser sentence, even without relying on two of the seven aggravating circumstances, so the court's improper reliance on those two factors was harmless error.

In his reply brief, defendant makes several arguments based on misunderstandings of the new legislative scheme. First, section 1170, subdivision (b) does not require defendant's prior convictions to be proven by certified records. Rather, subdivision (b)(3) permits a trial court to review certified records in lieu of submitting the factual determination of the existence of prior convictions to a jury. (§ 1170, subd. (b)(2)-(3).) This optional method of proof does not affect our analysis above, where we determine what a jury would have found based on the evidence offered—and not disputed—at the sentencing hearing. We do not consider certified records at all because "we will not presume the existence of extrarecord materials." (*Zabelle*, *supra*, 80 Cal.App.5th 1098, 1115, fn. 6.)

Second, the trial court did not "impose a greater penalty than that fixed by the statute violated." The statute defining assault with a semiautomatic weapon on a peace officer establishes a maximum sentence of nine years in prison, which defendant received. (§ 245, subd. (d)(2).) The cases defendant cites are inapt. *Porter v. Superior Court* (2009) 47 Cal.4th 125, 138 dealt with double jeopardy and held that the Sixth Amendment did not convert allegations that attempted murder was willful, deliberate,

18

and premeditated and committed for the benefit of a criminal street gang "into actual elements of greater offenses for purposes of the statutory double jeopardy protection of section 1023." *People v. Betts* (2005) 34 Cal.4th 1039, 1054 held that "a jury trial on the factual questions that establish jurisdiction is not required by the federal Constitution." (Fn. omitted.) *In re Howard* (1945) 69 Cal.App.2d 164, 165 found, after the defendant petitioned for a writ of habeas corpus, that the trial court had incorrectly found the defendant had a prior felony conviction qualifying him for a longer sentence, rendering the excessive portion of the defendant's sentence void. None of these cases bear on the issues in this case.

Finally, defendant claims harmless error analysis is inapplicable because his upper term sentence is "unauthorized." As defendant notes, an unauthorized sentence "could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Where a "defendant argues only that the court abused its discretion in aggravating his sentence . . . [because] factors cited in support of such choices were inapplicable, duplicative, and improperly weighed," the sentence is not unauthorized. (*Id.* at p. 355.) Here, an upper term sentence can lawfully be imposed pursuant to section 1170, subdivision (b), so the rule governing unauthorized sentences does not apply and we must determine whether any errors are prejudicial. (*Scott,* at p. 355.)

DISPOSITION

The judgment is affirmed.


/s/
BOULWARE EURIE, J.

I concur:


/s/
ROBIE, Acting P. J.


I concur in the result:


/s/
MAURO, J.